May it please the Court, my name is Michael Gilmore. I'm a Deputy Attorney General representing the State of Idaho and the Idaho Lottery. This appeal presents issues concerning the construction of provisions of the gaming compact between the Shoshone-Bannock Tribes and the State of Idaho. In particular, those provisions that address what happens when other compacted to add additional games, and what happens when the District Court declares what games are permitted under this compact. These provisions are particularly important because this compact is unique in my experience, and I would think at least unusual, in that it does not name by name any particular Class III game that is the subject of the compact. Instead, it has two provisions, two belt and suspenders provisions, if you will, that turn to other sources of law to determine what games are allowed under this compact. The first provision is in Section 4.A of the compact, and that just mirrors the language of IGRA, the Indian Tribes May Conduct Any Game That Is Otherwise Played By Any Person, Organization, or Entity in the State of Idaho. That was negotiated before this Court's decision in Artichoke Joe, which explains some of the origin of the other provision that adopts of the law, which is Section 24.D of the compact. That section says that if other tribes' compacts are amended to allow additional games that are not covered by the Shoshone-Bannock Compact, then the Shoshone-Bannock Compact should be amended. Now, we now know, because Artichoke Joe has been decided, that Indian tribes are considered other persons, organizations, or purposes of IGRA, and it would seem that these two are now somewhat a belt and suspender with regard to other tribes. The question that you may have, one question you may have about this compact is why were the state and the Shoshone-Bannock tribes unable to agree on a definition of what games would be compacted? And the compact itself gives us that answer. In Sections 3.0 and 3.R, the respective positions are set out. The state took the position that there were three kinds of games that could be compacted. They would be lotteries, parimutuel racing, and bingos and raffles, which were considered similar. The Shoshone-Bannock tribes took the position in 3.R that they could conduct any Class III game other than sports betting. So what the parties finally agreed to, and this is laid out in Section 5 of the compact, in Section 5.B, the parties agreed to give, they punted, they agreed to give to the Federal District Court for the District of Idaho the right to issue declaratory judgments. Either side could bring a suit in that court to declare what games are or are not permitted under the compact. And then in 5.C, the parties set out a mechanism for what happens after the Federal District Court issues its declaration. They say in 5.C.1, in the event that the court determines that certain gaming activities are not permitted, the tribes will be precluded from offering those gaming activities. In 5.C.2, it says, in the event the court determines that certain gaming activities are permitted in the context of the Act, the tribes will be entitled to expedited implementation of such games as is consistent with this judgment. And then in the next provision, 5.C.2a, the parties subjects of negotiation under the Act. Proper subjects of negotiation under the Act, as this Court has held in the consolidated Indian gaming cases out of the State of California, include negotiations over things such as number of games, that is, size of facilities and the like. Well, how does this all tie into this case? Now I need to get back into the signed in 2000, approved by the Secretary of Interior in 2000, and pursuant to the terms of the compact, both sides filed suit early in the year 2001. At that same time, there was a bill in the Idaho legislature which addressed compacts with three of Idaho's, the three northern Idaho tribes, the Kootenai, the Coeur d'Alene, and the Nez Perce. Those compacts contained the definition of something called a tribal gaming device. And in those compacts, the three northern tribes would have agreed to limits on the number of games, the number of tribal gaming devices. Well, the Governor didn't have the political wherewithal to get those compacts to the legislature. They were defeated by the Senate. In the meantime, though, there had been a stipulation of the parties, which is document five in the record, that agreed to put this case on hold to see what would happen with those compacts. And that was one of several stipulations. That stipulation in paragraph three also said that the Shoshone-Bannock tribes would participate in the limits on number of games if that, if those three northern compacts took place. I'm sorry. Paragraph three said they would do what? They would participate in the limits of number of games. Let me.  The stipulation. It's document five. And it just said that they would be bound by the same type of limits contained in those compacts. What happened then was an initiative process. The three northern tribes lost in the Senate, but won before the people of the state of the 2002 general election ballot. And this initiative referred to tribal video gaming machines, which was essentially the same type of thing as were in the earlier compact amendments. And they contained provisions saying that the tribes may operate these tribal video gaming machines and also contain limits on how many machines they had. The northern tribes which authored these chose not the 2001, January 1st, 2001 baseline that had been in the earlier negotiated compacts, but chose a 2001, excuse me, January 1st, 2002 baseline from which they could grow by five percent a year and up to 25 percent over ten years. That initiative was passed. There were challenges to it. The Idaho Supreme Court rejected the challenges, not on the merits but on procedural grounds. And so about six or nine months later, that had worked its way through the state court system. And we then had the question of, well, what is the effect of this tribal gaming initiative upon the Shoshone-Bennet compact? Can I ask you a preliminary question? Certainly. It may not be pertinent, but I was wondering if these other tribes that agreed to the limits if they had Most Favored Nations clauses like Shoshone-Bennet Clause 24 in their compacts. To my knowledge, the Shoshone-Bennet is the only stand-alone Most Favored Nation clause, but I don't want to If it's not in the record, then maybe we shouldn't get into it. What I was wondering was whether the effect of the district court opinion here that Shoshone-Bennet can do the gaming without limits would have the effect of under other compacts, meaning nobody had any limits. To my knowledge, no, but I've never really thought that through, and I hesitate to say that as an official position. That's not part of the record. Okay. The initiatives itself did not include a Most Favored Nations clause in their model compact. No. The initiative set forth the definition of tribal video gaming machines and then set forth the terms for acceptance of the initiative's terms for amending a compact. As the Shoshone-Bennet compact is written, it doesn't have any limits, does it? I mean, yet, at least. No, it does not, and the parties never reached the point under IGRA or under the compact in which that would then be the subject of negotiations. That is, the compact says once the district court has declared that games X, Y, and Z are allowed under the compact, then there is a provision for negotiations for any term allowed under the Act. That's where we got stuck at the district court, and the district court just simply said you can do everything, and the district court did not order any negotiations. The district court said you have the games, and we do not contest the Shoshone-Bennet tribes have the right to operate tribal video gaming machines. Our issue, as we said in our conclusion, is whether they have to accept the terms of the Shoshone-Bennet tribes, or whether they have to go down and negotiate other sets of terms, and that's what we're asking for. We are not asking that they be prohibited from operating these particular games. We're asking to accept the terms the other tribes have, or to negotiate alternative terms. Suppose they negotiate to an impasse and say we won't take the terms of the other tribes. Isn't that where they are now? We have not ever had those kinds of formal we have not had a formal court declaration saying this is the game, go negotiate. Well, what do you mean by negotiate? I mean, so they sit around the table, and they say we're negotiating, but the answer is no. Is there some sort of implied covenant of good faith in fair dealing where you can't say no? Does negotiate mean you have to concede? No, negotiation doesn't mean either side has to concede, and IGRA has a cascade of provisions for what happens when there's an impasse. For example, there are provisions for arbitration in this compact. IGRA has provisions for what happens if a state and a tribe cannot agree. And in the extreme, IGRA even has provisions for states that are found not to have negotiated in good faith to be cut out of picture entirely, and it just winds up being between the Secretary of the Interior and the tribes. So there is a whole cascade of provisions if there's any allegations of bad faith or any findings of bad faith. They're in the compact, which provides for arbitration. They're in IGRA, which provides this kind of reasoned, direct response if the tribes and the state are unable to reach an agreement. The essence of our position is that there are really two alternatives under IGRA, under the compact, and under the Tribal Gaming Initiative itself. Take what is offered by the Tribal Gaming Initiative or sit down and negotiate an alternative. But you don't get the benefits of the Tribal Gaming Initiative without at least sitting down and talking about any of the burdens in a negotiation, in a good faith negotiation. Now, the burdens, in thinking about this, I was wondering if the burdens were necessarily linked together or if they could be analyzed separately. One burden is a quantity limit, which I think is not really addressed in the Shoshone-Bannock compact as initially agreed. The other burden is a regulatory provision to pay a certain percent net revenues for education, as I understand it. And that's at least arguably inconsistent with an express term of the Shoshone-Bannock tribes compact, I think, unless I'm missing something. And so I was wondering if they're necessarily linked together or if they could be analyzed. For example, under your theory, could the Shoshone-Bannock tribes be required to negotiate about a quantity limit but not about whether they are going to be subject to paying a tax? I think they are subject to negotiation on all issues that IGRA brings up. One would be a quantity, that IGRA allows, I'm sorry. One would be a quantity limit. And in the Indian gaming cases that were consolidated out of California, one of the negotiations and one of the things that happened in the end was the creation of a fund whereby tribes that were compacted and offering gaming because of their fortuitous geographic circumstances would pay into a fund for tribes that did not. So in terms of the big question, whether those are negotiable items, I would say both are. Now, whether an end negotiation would address both of those is really up to the negotiators, really up to the bargaining. And I don't know. Negotiations are in the governor's hands in Idaho. They're the governor's staff. It's always delegated down. We're going to have three governors in Idaho in the next nine months, and I can't tell you what instructions any particular governor would give with regard to those. But if negotiations reach an impasse, if there are accusations that the state has behaved in bad faith, if there are accusations that the state is bringing in terms that simply cannot be negotiated under IGRA, their arbitration, there's a whole cascade of procedures to follow at that point. And we don't need to anticipate the state or the tribes will misbehave or negotiate in bad faith. There's a general presumption that governments operate the way they're supposed to do, and we would believe that both sides would negotiate in good faith. But we don't need to get there yet because we're a long ways away from that. What we are looking for is what we said in our conclusion of our brief. Either hold that the tribes must enter into negotiations, or if they don't, if they just want to unilaterally go with the tribal gainment initiative, they are subject to the tribal gainment initiative in its entirety. With that, I'll reserve the rest for rebuttal unless there are no questions right now. Your Honor? Well, if I understand the state's position, it's that the Section 24B can't be effectuated at all without negotiation. Yes, sir. The 24D is tied to 4A. I'm wondering why the state's position isn't, well, 24B says what it says. The tribe now has the right to conduct these kinds of games, and now it's time to go on to paragraph 5, and we'll start talking about how many. Well, unless I misunderstood the district court's opinion, we don't have that option under the district court's opinion to talk about how many right now. Thank you. Okay, Mr. Crowell. Good morning. It pleases the Court. My name is Scott Crowell. It's been my honor and privilege to represent the Shoshone-Danik tribes in gaming matters for several years. Together with me in the courtroom is the Vice Chairman of the Tribal Council, Nancy Murillo, and she represents the elected body, the governing body of the tribe. We welcome you to our court. Thank you. You know, this case should be put in its historic context. The dispute between the Shoshone-Danik tribes and the state of Idaho regarding the scope of permissible gaming is a very long one. It goes back to the early days from the passage of the Indian Gaming Regulatory Act. The state was in negotiations with four of the five tribes in Idaho, including Shoshone-Danik, shortly after the act went into effect. Those early negotiations ultimately ended up in agreement that three of the tribes signed, citing the games that Mr. Gilmore cited in his argument this morning, lottery, bingo, raffles. Shoshone-Danik tribes did not sign that compact because it did not expressly address an attempt to resolve the issue of machine games. The position of the Shoshone-Danik tribes before the passage of Proposition 1 and since its passage has always been that if you apply the public policy scheme of the state of Idaho regarding gaming activities and look at what the lottery offers, look at what is offered within the context of state law,  and in negotiating a compact, the question is what does the tribe have a right to do in terms of applying federal law, the state law, to determine the scope of permissible gaming. But once you've signed a compact, it's a question of contract law. What did you agree to do? And therefore, the Shoshone-Danik tribes did not sign the same compact that the three northern Idaho tribes had signed. Instead, we stayed at the negotiation table. We stayed there for several years. We went through a couple of different governors. We went through a statewide commission that had actually made recommendations in favor of the tribes but still did not get into a compact until ultimately we agreed to disagree over what the scope of permissible games were. The tribe that initially sought its remedy under IGRA back in the early 1990s, the state of Idaho raised the 11th Amendment defense, and as we know, ultimately the Supreme Court in the Seminole case versus Florida ruled that that defense was effective, so we were deprived of our remedy. So we stayed at the negotiation table until we got some affirmative resolution. And because the state, in the context of the compact, agreed to waive its 11th Amendment immunity, we felt that we finally had a platform on which we could resolve the issues. Then the three northern Idaho tribes, who, by ruling affirmed by this court, their current compacts or then existing compacts did not allow for machine games, started these discussions with the governor for the tribal video gaming device. Those negotiations were successful, but the legislature wouldn't ratify those agreements, so the three northern tribes took that to a statewide ballot initiative. We entered into stays in this litigation because it was agreed that passage of those initiatives would move the question, because the tribe was agreeing that if the resolution passed, it would make sure that the machines operating in Shoshone-Bannock lands conform to the definition of tribal video gaming device under Proposition 1. What is not in the government's brief that is a bit frustrating is the compact, which is an exhibit to their brief and in the excerpt of records, laid out a very extensive comprehensive scheme in the way the gaming was going to be regulated, in the way the background checks and licensing would be done, what the interplay between the tribe and the state would be in terms of regulating games in anticipation of either winning or losing in that declaratory judgment actions over the scope of permissible games. It has in it a regulatory scheme that would apply to an unlimited number of gaming devices, and yet the state now is arguing in its appeal that, well, we should go back to the negotiation table and talk about those kinds of issues. When we sat down after Proposition 1 went into effect, the state said, well, we're not going to sign off on your operating these games unless you agree to the 5% tax that goes to educational entities, and you agree to the arbitrary limits on the numbers of games. Now, this was even inconsistent with the prior stipulation. Mr. Gilmour speaks incorrectly when he says, we agreed that we would limit, Shoshone-Bannock agreed that it would limit the number of devices in that first stipulation in the same manner that the other tribes agreed that they would limit the number of devices. Now, the way it works in Idaho is that you have a very small tribe in northern Idaho that funded this initiative and during that time took the number of gaming devices that the state contends were illegal and put 1,800 devices in its facility, and said, well, we're going to use how many devices you're operating on a game certain and that's how many devices you can play. What Shoshone-Bannock tribes said in the stipulation is, we won't agree to that freeze of operating the number of devices that you have on a certain date and increasing it 5% a year after that. What we agreed to was parity that says the Shoshone-Bannock tribes will not operate any more devices than any other tribe operating in the state because we were being conservative wanting these issues resolved while the Coeur d'Alene tribe had gone through this huge expansion. So if you simply took Proposition 1 and imposed it upon the Shoshone-Bannock tribes, you would have a tribe that has by far the largest land base, largest stewardship responsibility, largest enrollment in the state being relegated to the opportunity of operating less than half the number of devices that a much smaller tribe in the northern reaches of the state were able to offer. So when the state sat down and said, well, you've got to agree to what these other terms were, they said, no, wait. The compact says that if a state enters into a compact with another tribe, our compact shall be amended to allow for those additional gains. The historic debate that has gone on going way back into the 1980s and the early decisions that ultimately led to the Cabazon decision was when a state tries to impose its policy on gaming on a tribe, how far can it go? And the case law that we cite quite clearly and even the state's own revision or version of that case law says that a regulatory scheme is not imposed upon a tribe unless the tribe specifically agrees that that regulatory scheme is to be applied to that tribe in the context of a tribal state compact. Shoshone-Bannock's signature is not on Proposition 1. It was not a sponsor of Proposition 1. It did not sign a Proposition 1 compact. It had previously signed the compact that you have in your record. And it expressly provides for what circumstances dictate what games the tribes are able to play. We felt that Proposition 1 mooted this longstanding dispute between the tribe and the state because now the state no longer contends that these devices, these tribal video gaming devices, are a permitted form of gaming as you apply Idaho state law to the Indian Gaming Regulatory Act. I agree that under your contract the state now cannot take the position that you can't use these games, you can't play these games. But under your compact, can't the state say now we have to negotiate how many? There's a provision in the compact that allows the state or the tribe to say, you know, we want to renegotiate issues. But is it your position then, as the compact originally was signed, there was simply no limit? That's correct. In other words, you sat down and said, we can't agree on what kinds of games can be permitted and we've got a system to resolve that. But whatever is resolved, it's unlimited. That's correct. That's right. And that was the position we took. What's the, what would be the purpose of Section 5's arbitration provisions then? Well, I think it would be a good question to ask back to the state because it's one that we did and we tried to ask in the context of this brief. Is there a regulatory concern that the current scheme overlooks in terms of the integrity of the game, the internal controls of the game, the manufacturing and the licensing of the manufacturers of the game? You know, if there's something that they can come forward that is a legitimate regulatory issue to protect the integrity of that game, that's something that even to this day, you know, we're willing to sit down with the state and talk about those issues. A limit on the number of machines is one to where if they were to trigger that section and they were to say, we think everything's fine except the number of machines, well, first, it's difficult to anticipate what our response would be because we're not in that context. But secondly, the limit on the number of machines, if they're going to present it, that they should present it in a way that has some connection with protecting the integrity of those games. The state of Idaho doesn't tell the Idaho lottery how many outlets the lottery will have. The state of Idaho doesn't regulate the number of visitors on the state highway between Twin Falls and Jackpot, Nevada, to limit the number of Idahoans that can go to Jackpot to game. If the state has a regulatory basis for trying to impose a limit on us, then they should trigger the section that you refer, there's two sections that they could trigger, either Section 5 or there's a general provision that either side can ask for renegotiations, raise the argument, put up the argument that they believe justifies a hardline imposition on a limited number of games, and if we have disagreement, then we go forward with the dispute resolution mechanisms in the compact. But what the position of the state in this litigation is, you can't authorize, you can't offer tribal gaming devices until you sit down and agree to the exact same terms that the other three tribes in the state have agreed to. Our compact doesn't contemplate limits on the number of machines. Our compact contemplates payments to the state under very limited circumstances. We negotiated those. The fact that Proposition 1 became state statutory law does not entitle the state to come back and renegotiate items that it previously negotiated in the Shoshone-Bannock compact. It's very specific. It says the compact shall be amended to allow for the additional game, not the compact shall be reopened for negotiations as to a broad range of issues. If they have a regulatory concern that's somehow related to an imposition of number of machines, there's mechanisms in the compact for them to pursue that without jeopardizing or changing Judge Wendell's order. What you're really saying is that the state can make proposals, and those would really be proposals to renegotiate parts of the contract, and we'll talk. But we don't have to do it because we've got a compact. Well, no. The compact provides that if they trigger a provision for renegotiation, and we don't negotiate in good faith, then they have the remedy of taking us to either arbitration or to the remedy under AGRU. Well, how do they do that? How can they do that if they think that limiting the number of games is a state interest? They can trigger the provision under Section 5 that you mentioned, and if you give me a moment, I can identify the other provision in the compact. All right. Is there anything in the record as currently constituted to us that describes the economic impact of the situation if there's no limit for Shoshone-Bannock tribes, or conversely, that describes the state's interest in having a limit? Formally, evidence in the record, no. As we identify in our response brief that this argument of fairness that they brought up is the crux of their opening brief. We've seen that, but I meant, apart from the argument, you know, one tribe shouldn't be treated differently than these others, is there anything like opinion of an economist or opinion of some expert on how a lack of limit for Shoshone-Bannock tribes might affect the state or might affect the programs of the other tribes that do have limits? There's nothing in the record that I'm aware of to that effect. I believe that if that is the dispositive question, the appropriate result would be to remand this case back for that record to be created. I don't know if it is. I was just wondering about it. Is the district court decision under review, the one that was the subject of the agreement to participate in an initial declaratory judgment action? Yes. Yes. What happened? I didn't know whether that had sort of passed into... No. Both sides filed their complaint against the other for declaratory judgment action. And then the actions were consolidated. Then the state approached the tribes saying, you know, the governor's in these discussions and is going to be having legislation introduced regarding what ultimately is this tribal gaming device. Don't you agree that will mute it? And therefore, let's stay this state. So they would just stay it for a long time. Right. And then revive, then you got your judgment. Right. And at that point, the state was no longer... We agreed to narrow the issues by saying that if we can use this litigation to resolve that the tribal gaming device is a permitted form of gaming, then we don't have to pursue the remaining issues in the declaratory judgment actions regarding, you know, the full breadth and fine line drawing of where you draw that line between permitted gaming and prohibited gaming in the context of the Indie Gaming Regulatory Act. And that's why the issue on cross motions for summary judgment, the issues were narrow to if the tribal gaming device is going to be allowed, do the state tax and state limit on the number of machines also attach? And in terms of the record, and I don't know whether under... I haven't fully studied this, whether under the law interpreting the compact, the effect of not having a quantity limit matters, you know. But if it did matter, it sounds like the current record doesn't really tell us what the effect would be. It certainly does not. The argument presented by the state is that it should be imposed upon Shoshone Bannock because it was opposed upon or created and agreed to by three other tribes. As their issue is framed in the brief, it's whether, and I'm paraphrasing, it's whether the agreement that there be an amendment to permit such games includes the whole package from the initiative compacts. Including the payments and the number limits and stuff. Whether 24D kind of imports that whole package seems to me what the state says is the issue. And framing the issue that way, I think the answer is very clear, is what constitutes a permitted gaming activity is separate from what's required by the state for others in terms of a regulatory process or regulatory concept. And you have the definition of what a tribal gaming device is. And then you have this other provision that says, and you have to pay this 5% tax and you have to agree to this limit on the numbers. That regulatory scheme was not part of what Shoshone Bannock tribes agreed to. The game is the tribal gaming device. The regulatory scheme is something that only applies to the Shoshone Bannock tribes if the Shoshone Bannock tribes and their compact have agreed for it to apply, and they have not. Are these games all, are they all a physical, real world location? Yes. Like a casino? Yes. They're not on, like on the internet? No, no. These are, in fact, there's no dispute between the tribe and the state. Shortly after this litigation, the state came in and verified that all devices being played on the Shoshone Bannock tribes' lands fall within the definition of tribal gaming device. This is not an internet or computer world gaming at all. This is two physical locations on the reservation. On Fort Hall. On the Fort Hall reservation. Okay. Thank you. Thank you very much. Thank you for your argument, Mr. Crowell. Mr. Gilmore. Thank you, Your Honor. I'm glad to be briefer than my two and a half minutes that are left. In our conclusion, we framed our request of this Court in the alternative. The first of the alternatives was, please order them to negotiate. Because that's what IGRA calls for. That's what the Compact calls for whenever there's been a declaration of what games are allowed. Well, what would they have to negotiate on both conditions? They would. Or would it be both conditions that the other tribes agreed to, or those plus any others? The way IGRA and the Compact talk about, they talk about proper subjects for negotiation under the Act. The consolidated cases out of California said size of facilities was a proper subject for negotiation. It also had this provision for a trust fund for the other tribes to be a proper subject of negotiation. So I think as far as number of games, there's clear Ninth Circuit law saying that's a proper subject for negotiation. As far as the educational contributions, I would say we have an analogy with the consolidated games out of California. Because the educational contributions are to educational facilities on or near the reservation. That is, it's not disconnected. You don't have to ship it up to the University of Idaho, for example. My final comment is that the obligation to negotiate means just that. The record may not be clear, but Mr. Crowell was right. The Shoshone Bandit tribes did not stuff their casinos full of machines. So one thing that is negotiable would be a base date. That is, we're not going to take the position that One thing that is negotiable would be what? The proper base date. Where do you start your count? Does it have to be January 1, 2002? No, that's a negotiable item. But we do want to engage in those kinds of negotiations. Is there anything in the record that would suggest that if the Shoshone Bandit tribes put an unlimited number of these games in the casinos on their reservation, that that would have a significant impact on the state or on the other tribes' gaming? The record never reached those kinds of issues. The record doesn't develop what the nature of the markets are for these kinds of devices. No, we never talked about that. I don't know how significant geography is. Okay. I see my time is up. As you understand the State's judgment, it protects the tribe, at least the way you have the issue framed. I'm looking for the actual judgment here, which I have. Okay. The judgment says that the tribe, the Shoshone Bandit tribes, is entitled under the Compact to an amendment to permit them to conduct gaming using tribal gaming machines, as defined by the initiative Tribal Gaming Machines. It's authorized to conduct the gaming using video gaming machines, as defined, and that the machines used in their operations in May 24 are tribal video gaming machines. That's it. It's the memorandum. And you're reading that as saying that the State can never negotiate for a limit on these? I'm reading that as saying that the State has no right under Section 5 of the Compact to enter into the negotiations called for in Section 5 of the Compact, because the memorandum opinion said you don't get to do it. 24D gives you what you want. There's nothing more to be done. Well, it certainly gives you what kinds of games you can play. Yes. And we are not contesting the right to these particular machines. What you're saying is that what kind of games they can play comes with a particular tag from the initiative. We don't have to negotiate it or anything else. It just comes in. If... I'm saying is if there's no Section 5 negotiation, the only thing you get is exactly what the Tribal Gaming Initiative provides for. We think there should be a negotiation, because that's what Section 5 and IGRA say. I'm just not sure that the district court's addressing Section 5 at all. I'm not sure. I'll have to think. But you have a compact. You may have continuing rights as a party to that compact, and you may be able to do things that that compact authorizes if you have disputes about the contract. But I don't know that the district court got into that at all. I would just urge the Court to read the entire memorandum opinion, because I think it is... I'll read it. I've read it once. Okay. We will study it all further, and we really appreciate the excellent arguments on both sides. Thank you, Your Honor. So the String of Idaho v. Shoshone-Ithbanic Tribes case shall be submitted, and we appreciate the arguments. And, again, we thank you, and we thank your client for attending. So thanks to all of you. We shall adjourn for the day.
judges: Canby, Gould, Bea